[Cite as *State v. Jones*, 2017-Ohio-1121.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-128 |
| | | (C.P.C. No. 13CR-2345) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Antonio Jones, | : | |
| Defendant-Appellant. | : | |

---

### D E C I S I O N

#### Rendered on March 28, 2017

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

**On brief:** *Antonio Jones*, pro se.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Antonio Jones, from a judgment of the Franklin County Court of Common Pleas denying his petition to vacate or set aside his judgment of conviction.

{¶ 2} On May 2, 2013, appellant was indicted on two counts of murder in violation of R.C. 2903.02 (with accompanying firearm and repeat violent offender specifications), one count of tampering with evidence in violation of R.C. 2921.12 (with an accompanying firearm specification), and one count of having a weapon while under disability in violation of R.C. 2923.13 (with an accompanying firearm specification). The indictment arose out of the shooting death of James Edward Lane on April 30, 2013.

{¶ 3}   The matter came for trial before a jury beginning June 23, 2014.  In *State v. Jones,* 10th Dist. No. 14AP-796, 2015-Ohio-2357, ¶ 3-10 ("*Jones I*"), this court set forth the following recitation of the evidence presented at trial:

> Officer Trevor Wolfe of the Columbus Division of Police testified that on the night of April 20, 2013, he responded to a dispatch of a shooting to 764 St. Clair Avenue, the location of the Happy Family Bar. When he arrived, he saw [James] Lane with an obvious gunshot wound lying on the ground near a food truck parked at the bar's patio, and Officer Wolfe called for a medic. Officer Wolfe secured the scene until the detectives arrived.
>
> Darren Cunningham, who worked security for the Happy Family Bar, was working the night of the shooting. Though he did not witness the actual shooting, Cunningham testified that an hour prior to the shooting, Jones came into the bar wearing a New York Yankees jacket, was "very amped up," and did not want Cunningham to pat him down. * * * At that time, Cunningham said Jones did not have a weapon on him. Cunningham said that he kept a close eye on Jones while he was in the bar because Jones "kept running back and forth in and out of the door," and he did that "about five or six times consecutively in maybe a ten-minute period." * * * Cunningham said a man inside the bar kept telling Jones to "just calm down." * * * Cunningham described Jones' behavior while he was inside the bar as "very agitated." * * * When Jones left the bar for the last time, Cunningham followed him outside, but he did not see Jones in the parking lot, so he assumed Jones had left for good.  Approximately 20 minutes later, Cunningham saw a large crowd of people "stampede in the back door," so Cunningham went outside and saw Lane lying outside on the ground by the patio's back gate.
>
> Vernice Hill, Jones' cousin, testified that she knew Lane as a friend of her mother's, and that she learned that Lane had been shot on April 21, 2013 because her mother told her. Hill said that approximately 24 hours after the shooting, Jones came to her house wearing a New York Yankees jacket, "sweating real bad," and told her that he "shot somebody" at the Happy Family Bar. * * * Jones did not tell Hill who he had shot, but he indicated he "had some problems with another man." * * * Hill testified that Jones did not say anything to her about anyone pointing a gun at him or threatening his life

before the shooting. Jones told Hill he planned to go to Georgia "to get away from him doing the shooting." * * * While he was at her home, Jones placed a gun in a cabinet under Hill's kitchen sink. He also took off his New York Yankees jacket and placed it on the back of a chair. Jones asked Hill if he could take a shower at her house, and Hill agreed. When Jones was in the shower, Hill went over to her mother's house, and then she returned to her house where Jones was "starting to lay on the couch." * * * Around 7:00 in the morning, Hill went back to her mother's house where she called the police. Police came to Hill's house and arrested Jones. Following Jones' arrest, the police searched Hill's home and recovered the gun and the jacket.

Christopher Lewis, who was operating a food truck outside of the Happy Family Bar on April 20, 2013, testified that prior to the shooting, he saw Jones wearing a New York Yankees jacket, and he saw him get a gun out of the trunk of a car and place it in his pants. Lewis said Jones then went through the patio gate and into the bar. A few minutes later, Lane came to Lewis' food truck and ordered some food. Lewis had just turned around to face Lane when he saw Jones with the gun and then heard "maybe five, six shots." * * * Lewis testified he did not hear any arguments or threats just prior to the shooting. Lewis hid behind his barbeque smoker for a brief time, then came out and saw Lane on the ground saying "I'm hit, I'm hit." * * * Lewis saw Jones run away from the parking lot after the shooting toward St. Clair Avenue. Lewis did not see anyone other than Jones with a gun and said no one else fired a gun that night. On cross-examination, Lewis said it was possible he was mistaken about how many shots he heard that night.

Detective Lowell Titus of the Columbus Division of Police's assault squad testified he responded to the Happy Family Bar the night of the shooting because homicide detectives initially thought Lane had stabilized and would survive his injuries. Detective Titus said he spoke with the owner of the Happy Family Bar in order to obtain the surveillance video of the inside of the bar, the patio, and the parking lot. Detective Titus testified he spoke with Hill, and based on the information Hill provided to him, Detective Titus filed a warrant for Jones' arrest. After reviewing the surveillance video from both inside and outside the bar, Detective Titus said he did not see anyone pull a gun on Jones. The state played the surveillance video of the parking lot and patio area

in court for the jury to see. The video showed Jones walking toward a group of three people, then Jones walking away from the group. The video further showed that Jones was facing away from the direction he ultimately fired when he pulled the gun out, and he then turned back around with the gun before firing. Detective Titus could not tell from viewing the video how many times Jones fired his gun.

During Detective Titus' testimony, the state played the audio recording of Detective Titus' interview with Jones following his arrest. Jones said during the interview that he had problems with a man at the Happy Family Bar. Jones said that 25 or 30 minutes before the incident occurred, the man pulled a gun on him. He said that he was outside when the man "jumped" him, so Jones reached for his gun and shot the man, though Jones said "the bullet wasn't meant for the dude" and that he hit the wrong guy. * * * Jones said he only fired his gun one time. Jones told Detective Titus that the man he had been aiming for took off running after Jones fired his weapon. Jones said he did not know who any of the men were that he argued with at the bar. Jones said he stashed his gun in the bushes while he was inside the bar, then retrieved it from the bushes when he needed it.

Kenneth Gerston, M.D., a deputy coroner with the Franklin County Coroner's Office, testified that Lane died from a gunshot wound. The bullet entered Lane's body through his right arm and traveled into the right side of his chest. Mark Hardy, a forensic scientist with the Columbus Division of Police, testified that he analyzed the spent projectile recovered from Lane's body and that the spent projectile matched the gun police recovered from underneath Hill's sink.

Jones testified in his own defense. Jones stated he had often been on the receiving end of violence, saying he had been shot 12 times, stabbed 3 times, and run over by a vehicle 1 time, resulting in many hospitalizations. Turning to the events of April 20, 2013, Jones testified that he was arguing with someone at the Happy Family Bar and that the man showed him a pistol. Because of his history of being a victim of violence, Jones said he did not want to leave after seeing the man's gun because he was "scared." * * * Instead of leaving, Jones said he went outside and retrieved his own gun and "put it on [his] waistline." * * * When he encountered the man again, Jones said the man told him "I'm going to kill you." * * * Jones said he started to walk away but he saw the

man reaching and he saw a "brown handle," so Jones grabbed his gun and fired a shot because he has "been going through a lot in [his] lifetime and [he] learned about turning [his] back." * * * He said he "wasn't trying to hurt nobody," but that his "life was on the line," so he did "what [he] had to do." * * * Jones denied ever telling Hill he planned to get out of Columbus after the shooting. On cross-examination, Jones said he "hit the wrong guy" when he fired his gun.

{¶ 4}   Following deliberations, the jury returned verdicts finding appellant guilty of both counts of murder and the tampering with evidence count, as well as the accompanying firearm specifications. The trial court separately found appellant guilty of having a weapon while under disability, as well as the repeat violent offender specifications. For purposes of sentencing, the trial court merged the murder counts and imposed an aggregate sentence of 33 years to life.

{¶ 5}   Appellant appealed his convictions, asserting they were not supported by sufficient evidence and that the verdicts were against the manifest weight of the evidence. In *Jones I*, this court affirmed the judgment of the trial court finding both the sufficiency and manifest weight of the evidence supported appellant's convictions.

{¶ 6}   Appellant subsequently filed with this court an application to reopen his appeal pursuant to App.R. 26(B). In *State v. Jones,* 10th Dist. No. 14AP-796 (Dec. 1, 2015) (memorandum decision) ("*Jones II*"), this court denied appellant's application.

{¶ 7}   On June 4, 2015, appellant filed a pro se petition to vacate or set aside his judgment of conviction pursuant to R.C. 2953.21. In the accompanying memorandum in support, appellant argued that his trial counsel was ineffective in: (1) failing to call potential witnesses of whom counsel was aware, (2) failing to request a jury instruction on the lesser-included offense of manslaughter or involuntary manslaughter, (3) failing to visit appellant in jail more than three times before trial, (4) requesting too many continuances, (5) failing to properly cross-examine a witness, and (6) failing to pursue a "two-gun" strategy. On June 22, 2015, plaintiff-appellee, the State of Ohio, filed an answer and motion to dismiss appellant's petition. Appellant subsequently filed a reply to the state's answer and motion.

{¶ 8}   By entry filed February 10, 2016, the trial court denied appellant's petition to vacate or set aside his conviction. In its decision, the trial court found appellant's

second, fourth, fifth, and sixth allegations of ineffective assistance of counsel were barred by res judicata and that, alternatively, appellant failed to present evidence indicating deficient performance and/or prejudice as to any of those claims. The trial court further held that appellant failed to support his petition with evidence demonstrating deficient performance and/or prejudice as to the first and third claims.

{¶ 9} On appeal, appellant sets forth the following four assignments of error for this court's review:

> [I.] THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GRANT APPELLANT AN EVIDENTIARY HEARING PURSUANT TO R.C. §2953.21(C).
>
> [II.] APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING TRIAL IN VIOLATION OF THE OHIO CONSTITUTION, ARTICLE I §10.
>
> [III.] THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN DETERMINING THAT GROUNDS (5) AND (6) WERE BARRED BY RE[S] JUDICATA.
>
> [IV.] THE TRIAL COURT DEMONSTRATED BIAS IN FAVOR OF THE STATE TO THE PREJUDICE OF APPELLANT FOR FAILING TO CONSIDER EXCULPATORY EVIDENCE WHEN DETERMINING THE POST-CONVICITON PROCEEDING.

{¶ 10} The first, second, and third assignments of error raised by appellant in his pro se brief are somewhat interrelated and will be considered together. Under these assignments of error, appellant contends the trial court erred in: (1) failing to grant a hearing on his petition for post-conviction relief, (2) failing to find he was denied effective assistance of trial counsel, and (3) ruling that two of his claims were barred by the doctrine of res judicata.

{¶ 11} Under Ohio law, "[p]ostconviction relief is a civil collateral attack on a criminal judgment." *State v. Everson,* 7th Dist. No. 14 MA 0072, 2016-Ohio-3419, ¶ 21. R.C. 2953.21 governs post-conviction proceedings and states in part:

> (A)(1)(a) Any person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the

Constitution of the United States * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

{¶ 12} In reviewing a trial court's decision on a petition for post-conviction relief, "the standard of review to be applied by this court is abuse of discretion." *Everson* at ¶ 23.

{¶ 13} Under Ohio law, "[a] criminal defendant attempting to challenge his conviction through a petition for postconviction relief is not entitled to a hearing simply by filing the petition." *State v. Delmonico,* 11th Dist. No. 2004-A-0033, 2005-Ohio-2882, ¶ 13. Rather, "[t]he trial court has a duty to ensure that the petitioner adduces sufficient evidence to warrant a hearing." *Id.* In this respect, R.C. 2953.21(C) states in part: "Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief." Thus, "[w]here a petitioner fails to set forth substantive grounds for relief, he or she has failed to adduce adequate evidence to warrant a hearing." *Id.*

{¶ 14} Under his first and second assignments of error, appellant challenges the trial court's determination that he failed to demonstrate substantial grounds for relief on his claims of ineffective assistance of counsel to warrant a hearing on his petition. Under these two assignments of error, appellant focuses much of his ineffective assistance argument on the manner in which his counsel handled the trial testimony of Christopher Lewis, as well as his counsel's failure to call Tamiko Wyche as a witness.

{¶ 15} We first address appellant's claim that the trial court erred in failing to find he presented sufficient operative facts to demonstrate his trial counsel was ineffective in failing to call Wyche as a witness. In his petition, appellant argued his counsel should have used police interview statements from Wyche to demonstrate that she could not identify him as the shooter.

{¶ 16} In considering this claim, the trial court noted that this court had previously addressed, in ruling on appellant's application to reopen his appeal, a similar claim that his trial counsel was ineffective in failing to call certain witnesses at trial. Specifically, in *Jones II*, this court held that "even though [appellant's] appellate counsel did not raise

this argument during the direct appeal, we cannot say that there was a reasonable probability of success had he raised it." *Id.* at ¶ 6. The trial court, finding this court's prior decision relevant to appellant's current claim, concluded that appellant failed to demonstrate the outcome of the trial would have been different but for trial counsel's failure to call Wyche as a witness.

{¶ 17} On review, we find no error by the trial court. As indicated, appellant argued in his petition that his counsel should have called Wyche as a witness to demonstrate that she could not identify him as the shooter. As noted by the state, however, appellant's theory at trial was self-defense, and identification was not in serious dispute as appellant provided his own testimony that he shot Lane (albeit allegedly in self-defense). The state thus maintains, and we agree, that trial counsel reasonably decided not to challenge the state's evidence on identity but to focus instead on pursuing a self-defense theory. Moreover, nothing in the materials submitted by appellant suggests Wyche observed any other individual fire a shot. Finally, as previously observed by this court in addressing appellant's similar argument in his application to reopen "[t]he decision of whether or not to call a witness is generally a matter of trial strategy." *Id.*, citing *State v. Dunkle,* 10th Dist. No. 13AP-687, 2014-Ohio-1028, ¶ 19. In light of the above, including appellant's own testimony that he shot Lane while acting in self-defense, appellant cannot show his trial counsel was deficient in failing to call Wyche to testify she could not identify appellant as the shooter.

{¶ 18} In his petition, appellant also challenged the manner in which his trial counsel handled the trial testimony of Lewis. As noted in the above recitation of facts, Lewis was operating a food truck outside the bar on the evening of the shooting. At trial, Lewis testified that, prior to the shooting, he observed appellant "wearing a New York Yankees jacket, and he saw him get a gun out of the trunk of a car and place it in his pants." *Jones I* at ¶ 6. Lewis then observed appellant go inside the bar. A few minutes later, Lane, the eventual shooting victim, came to Lewis's food truck and ordered some food. Lewis had just "turned around to face Lane when he saw [appellant] with the gun and then heard 'maybe five, six shots.' " *Id.* Lewis, who observed appellant flee the parking lot after the shooting, did not hear any arguments or threats prior to the shooting.

Lewis further testified that he "did not see anyone other than [appellant] with a gun and said no one else fired a gun that night." *Id.*

{¶ 19} Appellant contends his counsel was ineffective in not impeaching the testimony of Lewis based on counsel's failure to produce evidence of a light-skinned black male, 6'0", 230 pounds, standing at the rear corner of the building pointing a gun. In support, appellant cites to a document originally attached to his reply to the state's answer and motion to dismiss the petition, which appellant designated as "Exhibit C" (and which he also attached to his appellate brief and designated as "Exhibit 11"). The document relied on by appellant is a police informational summary containing a police interview of Lewis. According to appellant, the informational summary contains evidence that an individual other than appellant had a weapon outside the bar.

{¶ 20} As noted by the state, however, a review of that document fails to support appellant's contention that Lewis told police investigators the light-skinned black male had a gun. Rather, the informational summary indicates that Lewis told the detective the "suspect" was the individual standing at the rear corner of the building pointing a gun; further, as also noted by the state, the summary reflects that by "suspect," Lewis was referring to the "black male, 6'0"-6'1", 240 lbs., braided hair, wearing a red t-shirt, black jeans, and a black and multi colored sequence New York Yankees jacket" (i.e., appellant). With respect to the light-skinned black male, the informational summary simply notes that "Lewis also mentioned that there was a light skinned black male, 6'0", 230 lbs, wearing a white t-shirt and jeans standing out there." The only other reference to this individual in the summary is a statement by Lewis that, following the shooting, "the light skinned black male in the white t-shirt kept trying to hold Mr. Lane's hand, saying they shot my brother." On review, we agree with the state that nothing in Lewis's statement supports appellant's "second gunman" theory. Accordingly, appellant has not demonstrated his counsel was ineffective in failing to question Lewis about a purported second gunman based on statements contained in the document at issue.

{¶ 21} Appellant also argues his trial counsel was ineffective in failing to introduce evidence of a second gunman theory based on statements by Vernice Hill contained in a police informational summary. We note this specific argument was not raised in appellant's petition to vacate. Rather, with respect to Hill, appellant argued in his petition

that his trial counsel should have reviewed statements by Hill "so that he could set up a hearing to Suppress Vernice Hill's statements, and also have the search warrant suppressed because of her mental health issues." The trial court addressed that issue, finding no merit to appellant's claim that his trial counsel's failure to cross-examine Hill's alleged mental competency constituted ineffective assistance of counsel.

{¶ 22} In support of his argument on appeal, appellant has attached to his pro se appellate brief a document he has identified, in handwritten notation, as "Exhibit 17." As noted by the state, however, this "Exhibit" was not attached to his petition before the trial court. As such, the document is not properly before this court on appeal. *See, e.g., State v. Herfurt,* 6th Dist. No. L-06-1295, 2007-Ohio-6363, ¶ 7 ("Attachments to appellate briefs which are not part of the record may not be considered on appeal."). We further note, in reviewing "Exhibit 17," that the purported evidence cited by appellant indicates the statement at issue was based on what appellant told Hill and that Hill told the police she thought appellant was "making that part up." Thus, even if the argument was properly before this court, appellant cannot show his trial counsel was ineffective in failing to introduce evidence of a second gunman theory based on statements in the informational summary.

{¶ 23} In ruling on appellant's petition, the trial court specifically addressed appellant's claim that his trial counsel was ineffective in failing to pursue a "two-gun" strategy, holding in part:

> The identity of Defendant as the shooter is undisputed. Defendant admitted to detectives that he shot the victim; the incident was captured on video tape; and Defendant testified on the stand to shooting the victim. Defendant fails to introduce evidence or demonstrate how the pursuit of this strategy would have created a reasonable probability of a different outcome.

(Feb. 10, 2016 Entry at 7.)

{¶ 24} On review, we agree with the trial court that the evidentiary record on appeal fails to allege substantive grounds to support appellant's second gunman theory. We thus find no error by the trial court in concluding that appellant failed to demonstrate

that, but for counsel's alleged deficiency in failing to pursue such a strategy, the outcome of appellant's trial would have been different.

{¶ 25} Appellant also argued in his petition that his trial counsel was ineffective in requesting a number of continuances and only visiting him three times prior to trial. The trial court addressed and rejected both of these claims. Specifically, with respect to the issue of continuances, the trial court, noting that appellant signed all but two of the continuance entries, found that appellant failed to demonstrate how continuing his case resulted in prejudice.

{¶ 26} In general, "[t]he fact that an attorney seeks a continuance * * * doesn't necessarily portray a violation of counsel's duty of representation. * * * The client's preferred defense strategies do not necessarily govern his counsel's decisions." *State v. Phillips,* 2d Dist. No. 2003-CA-15, 2004-Ohi0-4688, ¶ 41. Further, a defendant "must overcome the presumption that, under the circumstances, the delay caused by his attorney through the seeking of continuances, 'might be considered sound trial strategy.' " *State v. Tate,* 6th Dist. No. L-92-292 (July 16, 1993).

{¶ 27} On review, appellant has failed to show that his counsel's performance was deficient. As noted by the trial court, appellant agreed to most of the continuances, and we find no error with the trial court's determination that the record fails to show how trial counsel's request for continuances prejudiced his defense. Nor do we find error with the trial court's determination that appellant failed to present evidence demonstrating that the lack of visitation from his trial counsel somehow prejudiced his defense.

{¶ 28} Appellant's petition further alleged ineffective assistance based on trial counsel's decision not to seek a lesser-included charge of manslaughter or involuntary manslaughter. At the outset, we agree with the trial court's determination that this claim is barred by the doctrine of res judicata. *See State v. Barb,* 8th Dist. No. 94054, 2010-Ohio-5239, ¶ 22 ("claims that trial counsel should have sought a lesser-included offense instruction could have been raised at trial or on appeal and, therefore, are barred by the doctrine of res judicata in a postconviction relief proceeding").

{¶ 29} Notwithstanding its determination that appellant's claim was barred by the doctrine of res judicata, the trial court nevertheless considered the merits of the claim and found that trial counsel's decision not to request a lesser-included charge was a

reasonable trial strategy. We find no error with this determination. In general, the "[f]ailure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel." *State v. Griffie,* 74 Ohio St.3d 332, 333 (1996). As previously noted, appellant's theory was self-defense, and we agree with the trial court's conclusion that trial counsel's decision to use an "all or nothing" approach constituted reasonable trial strategy. *See, e.g., State v. Smith,* 8th Dist. No. 90478, 2009-Ohio-2244, ¶ 13 (trial counsel, who chose to pursue theory of self-defense, was not ineffective in failing to seek instruction on lesser-included offense of voluntary manslaughter; decision "was a reasonable trial strategy calculated to obtain a complete acquittal").

{¶ 30} In what appears to be a new argument on appeal, appellant asserts his trial counsel was deficient for failing to cross-examine the detective as to when he retrieved surveillance video of the shooting. Appellant contends the detective prepared a report indicating that he obtained, on the night of the shooting, a surveillance video from the bar where the shooting took place; appellant argues that, by contrast, the detective testified at trial he did not retrieve the video until days later. Appellant, however, has failed to demonstrate how such a discrepancy, i.e., on what date the detective retrieved the video, affected the outcome of the trial.

{¶ 31} Appellant contends under this third assignment of error that the trial court erred in finding his fifth and sixth claims were barred by the doctrine of res judicata. Those claims involved appellant's contention that his counsel failed to properly cross-examine a witness and failed to pursue a "two-gun" strategy. The trial court, however, in addition to finding those claims barred by the doctrine of res judicata, also considered the merits of those claims in denying the petition. Specifically, as discussed above, the trial court addressed and rejected appellant's claims that his trial counsel's failure to cross-examine Hill's alleged mental competency, or counsel's failure to pursue a "two-gun" strategy, constituted ineffective assistance of counsel. We have found no error with those determinations and, accordingly, even assuming those claims were not barred by the doctrine of res judicata, appellant cannot demonstrate prejudice.

{¶ 32} On review, we find no error with the trial court's determinations that appellant was not entitled to an evidentiary hearing or post-conviction relief as the

petition failed to set forth sufficient operative facts to establish substantive grounds for relief.  Accordingly, the trial court did not err in denying the petition without a hearing, and appellant's first, second, and third assignments of error are overruled.

{¶ 33} Under his fourth assignment of error, appellant argues the trial court exhibited bias in denying his petition.  Specifically, appellant contends he presented "overwhelming evidence of prejudice" which the trial court ignored.  As argued by the state, appellant essentially disagrees with the trial court's ruling denying his petition. Judicial rulings alone, however, "almost never constitute a valid basis" for a claim of bias. *Liteky v. United States,* 510 U.S. 540, 555 (1994).  Here, the record on appeal simply does not support appellant's assertion of bias by the trial court in ruling on his petition, and we therefore overrule the fourth assignment of error.

{¶ 34} Based on the foregoing, appellant's first, second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.

_____